NYLES G. GREER
Bar No: 65300712
LAURENCE R. MARTIN
Bar No: 948
RYAN STEWART
Bar No: 660058242
FELT MARTIN PC
550 N 31st Street, Suite 500
Billings, MT 59101
(406) 248-7646 (office)
(406) 534-2002 (fax)
ngreer@feltmartinlaw.com
lmartin@feltmartinlaw.com
rstewart@feltmartinlaw.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA – BILLINGS DIVISION

| | |
|---|---|
| BILLLINGS ELEMENTARY SCHOOL DISTRICT NO. 2, YELLOWSTONE COUNTY, and YELLOWSTONE ACADEMY SCHOOL DISTRICT NO. 58, YELLOWSTONE COUNTY,<br><br>Plaintiffs,<br><br>v.<br><br>J.D. and B.D., on behalf of their minor son, X.D.,<br><br>Defendants. | CV<br><br>**CV-26-67-BLG-TJC**<br><br>COMPLAINT |

## PRELIMINARY STATEMENT

Plaintiffs, Billings Elementary School District No. 2, Yellowstone County, and Yellowstone Academy School District No. 58, Yellowstone County, jointly bring

this action to appeal and challenge portions of the Order issued by the Hearing Officer within an Individuals with Disabilities Education Act ("IDEA") due process hearing. Plaintiffs will hereby be jointly referred to as "The School Districts." The School Districts wish to overturn the decision issued by the Hearing Officer as he failed to accurately consider IDEA law, did not adequately review expert testimony and gave certain expert testimony undue weight, and ultimately issued an incorrect ruling in part based on flawed reasoning under IDEA authority and the facts presented.

## PARTIES

1. Billings Elementary School District No. 2, Yellowstone County ("Billings Public Schools") is a public school district organized under Montana law, located in Billings, Yellowstone County, Montana. Billings Public Schools is a local education agency, within the meaning of 20 U.S.C. §1401(19), 34 CFR §300.28, and recognizes its duty to provide free and appropriate public education ("FAPE") to all of its students. Billings Public Schools receives federal funds from the U.S. Department of Education.

2. Yellowstone Academy Elementary District No. 58, Yellowstone ("Yellowstone Academy") is a public school district organized under Montana law, located in Yellowstone County, Montana. Yellowstone Academy is a unique school district within Montana, as its boundaries only encompass the campus of the

Yellowstone Boys and Girls Ranch. As such, Yellowstone Academy provides education to students who reside on the Yellowstone Boys and Girls Ranch and also provides educational services to students from nearby school districts who struggle with significant emotional and behavioral needs, based on recommendations from and agreements with the student's home district. These students attend Yellowstone Academy on a daily basis and are referred to as "day students." Yellowstone Academy is a local educational agency, within the meaning of 20 U.S.C. §1401(19), 34 CFR §300.28, and recognizes its duty to provide free and appropriate public education ("FAPE") to all of its students. Yellowstone Academy receives federal funds from the U.S. Department of Education.

3. J.D. and B.D. are the parents of X.D. X.D. was born in 2011 and is currently 14 years old. He resides with his parents in Yellowstone County, Montana. At all relevant times herein, X.D. and his parents were residents of Yellowstone County and resided within the geographical boundaries of Billings Public Schools.

## JURISDICTION AND VENUE

4. This action arises under the laws of the United States. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction pursuant to 20 U.S.C. §1415(i)(2) and (3) of the IDEA.

5. Venue in the Billings Division is proper, as the Defendants are located in Yellowstone County and the Plaintiffs reside in Yellowstone County.

## STATUTORY SCHEME

6. The IDEA (formerly known as the Education for All Handicapped Children Act, P.L. 94-142) was adopted in 1975 and most recently amended in 2004 "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for independent living." 20 U.S.C. §1400(d).

7. Educational programs for children with disabilities are designed and implemented through an Individualized Education Program ("IEP"), that contains, among other things, statements of the following: the child's present levels of academic achievement and functional performance; annual goals; and a statement concerning the special education and related services, and supplementary aids and services to be provided. 20 U.S.C. §1414(d).

8. Pursuant to 20 U.S.C. §§1415(b)(6) and 1415(f)(1), whenever there is a disagreement between the parents and a school district regarding the identification, evaluation or placement of the child, or the provision of a FAPE to the child, either party may present a complaint to be heard in an impartial administrative proceeding known as a "due process" hearing, conducted by the state educational agency.

9. As required by the IDEA, the Montana Office of Public Instruction has established an impartial hearing procedure and promulgated administrative rules governing that procedure.

## PROCEDURAL HISTORY

10. On August 19, 2025, B.D. and J.D., on behalf of their son, X.D., filed a request for a special education due process hearing against Yellowstone Academy and Billings Public Schools, pursuant to the IDEA.

11. On September 8, 2025, B.D. and J.D., on behalf of their son, X.D., filed a second complaint for due process against Billings Public Schools only. The September 8, 2025 complaint was ultimately correctly dismissed following the hearing on the grounds that the statute of limitations barred all allegations in the second complaint. The School Districts agree with this determination.

12. State Superintendent of Education Susie Hedalen appointed Morgan Lyman as the Hearing Officer in this matter on September 3, 2025.

13. An administrative due process hearing was held pursuant to 20 U.S.C. 1415 and 34 CFR §300.511 over the course of five days: January 26 through January 30, 2026.

14. On April 28, 2026, the Hearing Office issued his order finding that, in part, the School Districts had not correctly offered X.D. a FAPE as required by the IDEA. [Hearing Officer's Memorandum Decision and Order dated April 28, 2026,

attached as Exhibit 1.] The School Districts assert that this was an incorrect determination and aver that the School Districts provided X.D. a FAPE at all times at issue.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

15. The School Districts have exhausted their administrative remedies under 20 U.S.C. §1415.

## STANDARD OF REVIEW

16. The District Court reviews the Hearing Officer's decision *de novo* giving due weight to the Hearing Officer's findings but must consider the findings carefully and endeavor to respond to the Hearing Officer's resolution of each material issue. After such consideration, the Court is free to accept or reject the findings in part or in whole. *Michael P. v. Department of Education*, 656 F.3d 1057, 1066 (9th. Cir. 2011) (citing *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 121 (9th Cir. 2008). The evidence in an IDEA action consists of the administrative record and any additional evidence allowed by the District Court in its discretion pursuant to 20 U.S.C. §1415(i)(2)(C); *Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1471 (9th Cir. 1993), *cert. denied*, 513 U.S. 825, 115 S.Ct. 90, 130 L.Ed.2d 41. The ultimate question under IDEA is whether or not a school district offered an Individualized Education Program ("IEP") reasonably calculated to enable a child

to make progress appropriate in light of the child's circumstances. *Endrew F. ex rel. Jospeh F. v. Douglas County School Distr. RE-1*, 580 S.Ct. 988, 999.

## FACTUAL ALLEGATIONS

17. In August 2023, X.D. was a student of Yellowstone Academy and was enrolled through coordination, agreement and oversight with X.D.'s home district, Billings Public Schools.

18. X.D. was enrolled in Yellowstone Academy's specialized therapeutic day school setting serving a limited number of students qualifying for special education services. Yellowstone Academy's setting is one that provides educational services while embedding a therapeutic component throughout the day, including individual and group therapy intended to create an environment to address students' education and behavioral issues.

19. X.D.'s IEP for a majority of the relevant timeline at issue was "opened" with a meeting date of August 25, 2023. The IEP noted that X.D.'s disability category was "other health impairment." Within this IEP, X.D.'s parent, J.D. noted some concerns but stated that she would like to wait until an IEE (Independent Educational Evaluation) was complete to discuss the data as a team.

20. The August 25, 2023 IEP included sections concerning present levels of academic achievement, functional performance, and measurable annual

goals for X.D. The functional performance included reference to easyCBM test scores which are curriculum-based measurements used to gauge a student's ability. The tests can be done frequently to get data over time. MAPs testing, which is "Measure of Academic Performance" and a district wide assessment, was also utilized to form the basis of the academic achievement and functional performance of certain metrics included within the IEP.

21. The August 25, 2023 IEP listed measurable annual goals in the subjects and areas of math, reading, self-help/independence and social/emotional/behavioral, which were the special educational or related service areas noted within X.D.'s IEP. The measurable annual goals specified in the August 25, 2023 IEP were specific to X.D. and were created to enable reasonable progress in special education.

22. The August 25, 2023 IEP noted special education service areas, defining the setting of the service, the minutes per week in the different areas, and the dates of service in those areas. The IEP also included a "related service area" which the IEP team determined to be necessary for X.D. to benefit from the special education services. Within the related service area, the IEP specified 100 minutes of group therapy sessions per week and individual counseling sessions of 50 minutes per week.

23. Yellowstone Academy utilized its hybrid educational model for X.D.'s special education. Specifically, in X.D.'s classroom there was a certified K-8 teacher who provided special educational services in the class under the supervision of a certified special education teacher. The special education teacher oversaw the special education programming within the room, and regularly consulted with the classroom teacher, therapist, behavioral specialist, and paraprofessionals, who are all part of the classroom and X.D.'s educational team. The special education teacher helped implement and determine the delivery of special education services, data tracking, and assessments, and came into the room to support staff and the students. As this model was being implemented with X.D., the August 25, 2023 IEP noted that the educational setting was "regular education" considering that a "regular" K-8 teacher was the teacher of record for X.D.'s classroom.

24. For the special education service minutes listed in X.D.'s IEP, Yellowstone Academy's therapeutic day school model is one wherein direct instruction of certain minute categories occurs within the classroom, but the balance of the minutes including social/emotional/behavioral needs, are delivered and integrated throughout the school day, due to Yellowstone Academy's specialized setting as a therapeutic day school which allows for continuous coaching and skill development.

25. Yellowstone Academy provided the 1805 total minutes of special education services minutes listed in X.D.'s August 25, 2023 IEP as well as minutes of Yellowstone Academy's school week.

26. During the relevant time, all Yellowstone Academy staff received comprehensive and regular training aligned with Yellowstone Academy's therapeutic day school model and system of universal supports. Such training included, but was not limited to, violence prevention and de-escalation through the VIP model, crisis intervention, trauma-informed care practices, including the ARC (Attachment, Regulation, and Competency) framework, and cognitive behavioral strategies. This training was designed to ensure that all staff, regardless of role, implemented interventions with consistency and fidelity and were equipped to provide trauma-informed social, emotional, and behavioral supports across all settings and throughout the school day.

27. X.D. was supported at Yellowstone Academy by a multidisciplinary educational team consisting of a licensed teacher, a licensed therapist, a behavioral specialist, a special education teacher, and a paraprofessional. Collectively, this team constituted X.D.'s core service providers and was responsible for the daily delivery and implementation of X.D.'s educational program, including the provision of all of the minutes identified in X.D.'s IEP.

28. Included within X.D.'s IEP, dated August 25, 2023, were

"supplemental aides and services" which identify interventions that happen on a day-to-day basis, which are specific to X.D., and act as accommodations to benefit X.D. across educational settings in a reasonable effort to enable X.D. to make appropriate progress in light of his individual circumstances.

29. X.D.'s educational team was aware of and understood the accommodations listed within the supplemental aides and services sections, which were reviewed frequently by the educational team; the accommodations were not just things on paper, but things that the educational team understood.

30. The list of supplemental aides and services could never be an exhaustive list of accommodations attempted or considered by X.D.'s educational team, as it would be impractical to document all of the time, the effort, the collaboration that the team put into thinking about X.D. and his needs. The IEP, and the items listed in it, was merely the baseline by which the School Districts operated.

31. During the relevant time period at issue, Ms. Nicole Kostelecky, X.D.'s special education teacher, was involved in working directly with Ms. Melissa Garcia, X.D.'s regular education teacher, in formulating plans and adaptations to implement the IEP. Ms. Kostelecky generally oversaw the implementation of the special education within her classroom.

32. Ms. Kostelecky was responsible for implementing the IEP, to wit:

she was to ensure that the team and herself were consistently using accommodations, modifications, and instructional strategies tailored to X.D. She was also responsible for selecting and overseeing approaches that were reasonably calculated to enable X.D. to access the curriculum and make appropriate progress toward his IEP and other academic areas. Ms. Kostelecky satisfactorily performed her responsibilities.

33. The members of X.D.'s educational team at Yellowstone Academy worked together, typically daily, to discuss what sort of strategies worked, or did not work on any given day, and potential strategy moving forward. These discussions were informed by daily observation and analysis of X.D. and his individual needs. These discussions included conversations between Ms. Garcia, Ms. Kostelecky, and X.D.'s IEP team, including his parent, J.D., concerning ongoing behavioral issues and potential strategies to address the issues. Nothing remained static as the team constantly tried to change things to address the ongoing behavioral concerns. The whole team was responsible for implementing the accommodations within X.D.'s IEP and collaborated, typically daily, to ensure that X.D. was receiving the benefit of his IEP.

34. X.D.'s noted behavioral concerns were discussed with J.D. and other members of the IEP team. Other concerns such as X.D.'s sleeping in class were routinely communicated to J.D. Other observed behaviors included aggression on

staff and peers, choking, punching, self-harming, and spitting at individuals. These behavior issues, and issues related to absenteeism and refusals, were frequently discussed within IEP team meetings.

35. Ms. Garcia attempted to utilize all accommodations of classroom instruction listed in X.D.'s IEP dated August 25, 2023. X.D.'s accommodations were specifically meant to address his specific needs and differed substantially from other students' accommodations. Additionally, there were other strategies not specifically listed in X.D.'s IEP that the group had tried as potential methodologies to address his behaviors.

36. Ms. Tammy Rea, X.D.'s assigned therapist during the majority of the time at issue, planned X.D.'s individual therapy goals, was involved in IEP programming, and provided her opinions regarding X.D.'s progress, behavioral issues, attendance issues, non-engagement issues, and other issues relevant to X.D.'s education at Yellowstone Academy with the IEP team.

37. The therapeutic treatment plan for X.D. was reviewed on 90-day intervals. The plans were discussed with J.D. and X.D.'s outside therapist. J.D. consented to the plans via telehealth.

38. Ms. Rea and J.D. discussed issues related to X.D.'s participation in therapy services being offered, including other evident struggles that X.D. was having at Yellowstone Academy.

39. Yellowstone Academy records different types of documentation related to therapeutic services and other interventions, including therapy notes, which describe therapeutic services being offered including observations and school incident reports which highlight incidents of dysregulation which required intervention with X.D. and attempt to identify potential reasons for the escalation.

40. Ms. Rea cannot force students to participate in therapy and could not force X.D. to participate in therapy. Ms. Rea provided X.D. with the opportunity to participate in his allotted therapy minutes, and if for any reason she couldn't provide his scheduled minutes, she would attempt to offer the time later in the week or would let it be known that therapy could be requested. X.D. was not denied access to any of his allotted therapy minutes.

41. The IEP was amended on January 26, 2024 in response to a transportation concern that X.D.'s parents had noted concerning X.D.'s bus route.

42. The last IEP at issue while X.D. attended Yellowstone Academy was opened on August 23, 2024, and was not closed until J.D. signed off on the IEP on October 20, 2024. This IEP noted J.D.'s concerns at this time were peers within X.D.'s classroom, medical issues, school refusals, avoidance behaviors and illness. J.D.'s concerns regarding these issues were understood by X.D.'s educational team and were within their professional capacity and judgment as to how to address such

issues.

43. The IEP opened on August 23, 2024 differed from X.D.'s previous IEP as it related to present levels of functionality, and goals within all categorical areas of special education and related service areas. The goals within the August 23, 2024 IEP in all service areas were created to enable X.D. to make reasonable progress with his education.

44. Throughout the period of time covered by X.D.'s relevant IEPs and the formation of the same through IEP team meetings and discussion, the IEP team, including X.D.'s parents, considered whether further evaluation of X.D. was necessary, and the IEP team determined that it was not.

45. Within the Prior Written Notice sections of X.D.'s relevant IEPs while attending Yellowstone Academy, it was specifically noted that X.D. "is placed at Yellowstone Academy on a contracted basis to provide therapeutic special education services. If at any point either Yellowstone Academy or Billings School District wishes to terminate the contract, Billings School District will be responsible for implementing the IEP."

46. After X.D.'s change in classroom, Yellowstone Academy recognized that X.D. was not only furthering aggression towards his peers but was also coordinating efforts to get other students to physically attack their peers. The last incident involving X.D. at Yellowstone Academy involved X.D. punching

another student in the back of the head, unprovoked. As X.D. was being escorted out of the lunchroom, he looked at a younger student and threatened the student by saying "you're next." After deliberation, the administrators at Yellowstone Academy ultimately determined to discharge X.D., as was Yellowstone Academy's right as contained within X.D.'s IEP, because administrators were concerned about the safety of the other students. Administrators called J.D. to inform her of the decision on December 4, 2024.

47. Pursuant to X.D.'s IEP, he returned to Billings Public Schools for the provision of his special education services following discharge from Yellowstone Academy.

48. After X.D.'s discharge from Yellowstone Academy, a Prior Written Notice dated December 6, 2024, was sent to B.D. and J.D. explaining that Billings Public Schools had learned that X.D. was discharged from Yellowstone Academy and stood ready to provide special education services to X.D. at his home school, Castlerock Middle School. The document explained that Billings Public Schools was proposing X.D. attend the Behavioral Academic Social Emotional ("BASE") classroom as an offer of FAPE, as the BASE classroom could replicate the services X.D. was receiving at Yellowstone Academy.

49. Billings Public Schools has a winter break around the holiday season in December and January. The first conversation between J.D. and X.D.'s

special education teacher at Billings Public Schools, Ms. Jessica Spencer, was on January 6, 2025 when they discussed integrating X.D. into the BASE classroom at Castlerock Middle School. X.D. began attending Billings Public Schools on January 8, 2025. Shortly after beginning at Castlerock Middle School, X.D. was sick and out of school for over a week before returning to school.

50. The BASE program is intended for students with behavioral, social, or emotional regulation issues. The BASE classroom is focused on gaining skills related to such issues and is a more intensive setting as compared to a resource classroom or a general education classroom. Upon his return to Billings Public Schools, the BASE classroom was an appropriate placement for X.D. because it was equipped to provide the services listed in his IEP which had been developed at Yellowstone Academy and agreed to by parents while X.D. was still at Yellowstone Academy.

51. The meeting between J.D. and Ms. Spencer on January 6, 2025 was to begin the transition plan for X.D. following his discharge from Yellowstone Academy. Billings Public Schools did not rely on Yellowstone Academy to provide a transition plan but developed its own based on the setting at Billings Public Schools.

52. X.D.'s behavioral incidents while at Castlerock, including ongoing behavioral issues, were considered by the IEP team at a scheduled IEP team

meeting held on February 11, 2025. Billings Public Schools considered adjustments to the IEP based upon ongoing behavioral issues. After the IEP was opened on February 11, 2025, X.D. had a concerning physical incident on February 20, 2025, wherein he engaged in highly disruptive behavior and eventually struck a staff member in the face with a closed fist. During this event X.D. had to be placed in a closed room for the safety of X.D. and the staff.

53. After the February 20, 2025 incident, the IEP team, including J.D., attempted to revisit behavioral issues and potential strategies, including discussions of different potential methods of service delivery. The IEP team discussed potentially doing academics one-on-one through a virtual setting, with Ms. Spencer, as she believed she had a good relationship with X.D. The possibility of restorative practices was also discussed, considering the physical assault of a staff member. In Ms. Spencer's viewpoint, restorative practices would have helped with X.D.'s needs and allowed him to understand and take accountability for his actions. Ms. Spencer noted that this was never a possibility as J.D. did not return X.D. to Billings Public Schools.

54. Billings Public Schools never refused to provide educational services to X.D.

55. The February IEP remained in "draft" form considering that X.D., at his parents' option, did not return to Billings Public Schools, and the IEP was

never finalized. The options included in the draft IEP were not final and Billings Public Schools always remained, and still remains, willing to provide X.D. with an education and discuss options. J.D., when discussing options with the IEP team, did not ask for anything specific, but simply did not believe that there were viable options. J.D. unilaterally unenrolled X.D. from Billings Public School on or about March 17, 2025. Billings Public Schools sent X.D.'s parents an Offer of FAPE, informing them that Billings Public Schools remained obligated and was willing to provide X.D. with a FAPE.

56. X.D.'s medical diagnoses are not relevant in determining appropriate accommodations because the observational pieces of the deficits are what drive the accommodations, modifications, and goals that are needed. In other words, there are no specific defined interventions for autism in the educational setting, and as testified to by the School District's expert witnesses, the School Districts' approach, IEPs, and supplemental aids and services addressed X.D.'s education specific to him and his needs. The strategies employed overlapped with strategies one would find based on a disability category of autism.

57. Both Yellowstone Academy and Billings Public Schools made accommodations responsive to X.D.'s observational deficits.

58. There was no credible evidence that Yellowstone Academy and Billings Public Schools deprived X.D. of access to a FAPE.

59. X.D. was frequently absent from school. Yellowstone Academy and Billings Public Schools lacked the ability to reasonably force X.D. to attend and participate. Experts agreed that this was a hinderance for X.D. to fully benefit from the educational opportunities made available to him.

60. The expert retained by the parents of X.D. offered testimony about the lack of data recorded by the Yellowstone Academy. However, she then admitted that she had actually not been provided thousands of pages of data that Yellowstone Academy maintained. The expert retained by the School Districts testified that the type and amount of data kept by the School Districts was of the type and amount typical of public schools and enough to provide FAPE.

61. The expert utilized by X.D., and relied upon by the Hearing Officer, admitted to not knowing the functional differences between Montana and Ohio special education laws, nor what Montana specific regulations required or allowed. The expert admitted to not having Montana specific expertise. She further admitted that her opinions were based specifically on Applied Behavior Analysis "ABA" methodology, which is not mandated by IDEA, and the requirement of other jurisdictions that students must be evaluated for specific diagnosis to receive certain interventions, which is not true in Montana.

62. The School District's experts opined unequivocally that the School District's provided X.D. with a FAPE and had recorded the type of data

necessary to provide a FAPE. Moreover, the experts testified that an evaluation of autism was not necessary given the facts surrounding X.D., and that X.D. had received the same accommodations, intervention, and IEP implementation that would have occurred had he also been diagnosed with autism. The School Districts provided an IEP and related services that were based on X.D.'s unique needs, and which met IDEA standards for providing a FAPE.

63. The School Districts provided X.D. a FAPE at all times relevant to this Complaint and to the underlying Due Process Complaint.

CLAIMS FOR RELIEF

Plaintiffs incorporate by reference all allegations in paragraph 1 through 63 as though fully set forth herein.

64. Defendants Billings Public Schools and Yellowstone Academy are parties aggrieved by the Due Process Order within the meaning of 20 U.S.C. § 1415(i)(2)(A).

65. The Hearing Officer erred in concluding that Plaintiffs' failure to evaluate X.D. for autism on or after August 23, 2024, was a procedural violation which resulted in a substantial denial of FAPE to X.D.

66. The Hearing Officer erred in concluding that the move from the High School Building at Yellowstone Academy to Castle Rock BASE Program was a predetermination by Yellowstone Academy and a change of placement which are

procedural violations resulting in a violation of FAPE to X.D.

67. The Hearing Officer erred in concluding that X.D.'s IEP was not effective and was a substantial denial of FAPE, as the Hearing Officer misapplied facts and the relevant standards in reaching that conclusion.

68. The Hearing Officer erred in concluding that placing X.D. in a room with a shut door on one occasion at Billings Public Schools during a violent outburst was a material failure to implement the IEP and a substantive violation of FAPE.

69. The Hearing Officer erred in concluding that X.D.'s alleged lack of progress was connected to the lack of an evaluation for autism and that X.D.'s IEPs were not properly reviewed. In doing so, the Hearing Officer misapplied the relevant standards for considering FAPE under the IDEA.

70. The Hearing Officer erred in concluding that X.D.'s three IEPs at issue did not provide a FAPE under the IDEA. In doing so, the Hearing Officer misapplied the relevant standards for considering FAPE under the IDEA and gave undue weight to X.D.'s expert witness.

71. The Hearing Officer erred when finding that the School Districts did not adequately prepare or implement a functional behavioral assessment of behavior intervention plan amounting to a substantive violation of FAPE.

72. The Hearing Officer erred in ordering the evaluations, assessments, and compensatory education as set forth in the Order attached as Exhibit 1.

73. The Hearing Officer's finding of facts erred by failing to accurately consider the testimony and evidence presented within the Due Process Hearing at issue.

74. The Hearing Officer failed to adequately give deference to the expertise and exercise of judgement of school authorities. *Endrew*, 137 S.Ct. at 1001.

75. The Hearing Officer incorrectly allowed the opinion testimony of X.D.'s expert, which was legally and factually inaccurate, to guide the ultimate conclusions reached, while simultaneously failing to consider admissions by the expert which impacted the opinions offered.

76. The Hearing Officer's conclusions concerning violations of the IDEA were factually and legally incorrect based on the issues presented.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Declare that the portions of the Hearing Officer's Order wherein the School Districts were found to have not provided a FAPE were in error and are reversed;

2. Declare that the School Districts did provide a FAPE to X.D.

3. Declare that the portions of the Hearing Officer's Order finding that the School Districts violated the IDEA are reversed;

4. Declare that the remedies ordered by the Hearing Officer are reversed and voided;

5. Order that Defendants take nothing from their underlying Due Process Complaint;

6. Order that Plaintiff School Districts are the prevailing party;

7. Award Plaintiff School Districts reasonable attorneys' fees and costs in connection with the due process proceeding and this federal court action in an amount as determined in the discretion of this Court as authorized by 20 U.S.C. §1415(i)(3); and

8. Grant such other and further relief as the evidence supports and as this Court deems just and proper.

Dated this 27th day of July 2026.

FELT MARTIN PC

By: /s/ Nyles G. Greer
Nyles G. Greer
Attorneys for Defendants